IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

**GRACE GUTIERREZ,**

　　　　　Plaintiff,

vs.　　　　　　　　　　　　　　　　　No. CIV 09-496 LFG

**MICHAEL J. ASTRUE,**
**Commissioner,**
**Social Security Administration,**

　　　　　Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on Plaintiff Grace Gutierrez's ("Gutierrez") Motion to Reverse and Remand for Rehearing, filed October 6, 2009. [Doc. 15.] The Commissioner of Social Security issued a final decision denying benefits, finding that Gutierrez was not disabled and not entitled to disability insurance benefits ("DIB"). The Commissioner filed a response to Gutierrez's Motion [Doc. 16], and Gutierrez filed a reply [Doc. 17]. Having considered the pleadings submitted by the parties, the administrative record and the applicable law, the Court grants Gutierrez's motion and remands for additional administrative proceedings.

## I.　　PROCEDURAL RECORD

On February 2, 2006, Gutierrez applied for DIB [AR 59], alleging she was disabled since December 15, 2005, due to neck and back pain, anemia, hypertension ("HTN"), blurred vision, kidney problems, and diabetes ("DM"). [AR 42, 59, 80, 113.] Gutierrez's DIB application was denied at the initial and reconsideration levels. [AR 23, 25, 33, 42.] On November 13, 2007, the ALJ conducted an administrative hearing in Albuquerque, New Mexico. A non-attorney

representative was present with Gutierrez.  [AR 324-57.]  On June 16, 2008, the ALJ issued a decision finding Gutierrez not disabled. [AR 14-20.] Thereafter, Gutierrez filed a timely request for review.  On April 24, 2009, the Appeals Council denied Gutierrez's request for review and upheld the final decision of the ALJ.  [AR 3.]  On May 19, 2009, Gutierrez filed a Complaint for court review of the ALJ's decision. [Doc. 1.]

Gutierrez was born on May 30, 1943, and was 62 years old at the time of the ALJ hearing, an age defined as closely approaching retirement.  [AR 19, 59.]  Gutierrez has at least a high school education and worked for many years as a licensed practical nurse ("LPN"). [AR 18, 19.] Gutierrez earned over $30,000 per year and as much as $50,000 annually during many of her years of employment. [AR 50.]  After the disability onset date of December 15, 2005, Gutierrez worked a few months in early 2006, but did not work subsequent to that date.

Gutierrez was divorced three times and has no children. [AR 60.]

## II.    STANDARDS FOR DETERMINING DISABILITY

In determining disability, the Commissioner applies a five-step sequential evaluation process.[1]  The burden rests upon the claimant to prove disability throughout the first four steps of this process, and if the claimant is successful in sustaining her burden at each step, the burden then shifts to the Commissioner at step five.  If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.[2]

Briefly, the steps are: at step one, claimant must prove she is not currently engaged in substantial gainful activity;[3] at step two, the claimant must prove her impairment is "severe" in that

---

[1]20 C.F.R. § 404.1520(a)-(f) (1999); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

[2]20 C.F.R. § 404.1520(a)-(f) (1999); Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989).

[3]20 C.F.R. § 404.1520(b) (1999).

it "significantly limits her physical or mental ability to do basic work activities . . . .;"[4] at step three, the Commissioner must conclude the claimant is disabled if she proves that these impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1 (1999);[5] and, at step four, the claimant bears the burden of proving she is incapable of meeting the physical and mental demands of her past relevant work.[6]  If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering claimant's RFC,[7] age, education and past work experience, she is capable of performing other work.[8]

At step five, the ALJ can find that the claimant met his burden of proof in two ways: (1) by relying on a vocational expert's testimony; and/or (2) by relying on the "appendix two grids." Taylor v. Callahan, 969 F. Supp. 664, 669 (D. Kan. 1997).  For example, expert vocational testimony might be used to demonstrate that the claimant can perform other jobs in the economy. Id. at 669-670.  If, at step five of the process, the Commissioner proves other work exists which the claimant can perform, the claimant is given the chance to prove she cannot, in fact, perform that work.[9]

In this case, the ALJ relied on testimony from a vocational expert for his finding of non-disability at step five of the analysis. [AR 14-20.] The Court observes that the ALJ mistakenly

---

[4]20 C.F.R. § 404.1520(c) (1999).

[5]20 C.F.R. § 404.1520(d) (1999).  If a claimant's impairment meets certain criteria, that means her impairment is "severe enough to prevent him from doing any gainful activity."  20 C.F.R. § 416.925 (1999).

[6]20 C.F.R. § 404.1520(e) (1999).

[7]One's RFC is "what you can still do despite your limitations."  20 C.F.R. § 404.1545(a).  The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy.  Those categories are: sedentary, light, medium, heavy and very heavy.  20 C.F.R. § 405.1567 (1999).

[8]20 C.F.R. § 404.1520(f) (1999).

[9]Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).

recited standards applicable in the five-step sequential process.  At step five, the ALJ stated that the "claimant generally continues to have the burden of proving disability at this step," although "a limited burden of going forward with the evidence shifts to the Social Security Administration." [AR 16.] This, of course, is an incorrect statement of law.[10]

The Tenth Circuit Court of Appeals previously explained if the claimant establishes at step four that she cannot return to her past relevant work, the burden of proof shifts to the Commissioner at step five to show she retains the RFC to perform work in the national economy, given her age, education and work experience.  Grogan v. Barnhart, 399 F.3d 1257, 1261 (10th Cir. 2005).  In an unpublished opinion, the Tenth Circuit further stated that "[t]he claimant has no burden on step five." Stewart v. Shalala, 999 F.2d 548, at *1 (Table, Text in Westlaw), 1993 WL 261958 (10th Cir. Jun. 28, 1993) (citing Thompson v. Sullivan, 987 F.2d 1482, 1491 (10th Cir. 1993)).  Thus, the ALJ's explanation of the claimant's burden at step five is not in accord with circuit law.  The ALJ should revise or clarify his summary of the five-step process.

## III.   STANDARD OF REVIEW

On appeal, the Court considers whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards.  Langley v. Barnhart, 373 F.3d 1116, 1118 (10th Cir. 2004).  To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance.  Doyal v. Barnhart, 331 F.3d 758, 760 (10th Cir. 2003); Langley, 373 F.3d at 1118; Hamlin v. Barnhart, 365 F.3d 1208, 1214 (10th Cir. 2004).

---

[10]Most, if not all, of the ALJ decisions presented to this Court recite similar boilerplate language summarizing the five-step process.  That summary should be reviewed and revised in accordance with Tenth Circuit law.

The Court's review of the Commissioner's determination is limited. Hamilton v. Sec'y of HHS, 961 F.2d 1495, 1497 (10th Cir. 1992). The Court may not substitute its own judgment for the fact finder, nor re-weigh the evidence. Langley, 373 F.3d at 1118; Hamlin, 365 F.3d at 1214; Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991). Grounds for reversal also exist if the agency fails to apply the correct legal standards or to demonstrate reliance on the correct legal standards. Hamlin, 365 F.3d at 1114.

It is of no import whether the Court believes that a claimant is disabled. Rather, the Court's function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision and whether the correct legal standards were applied. Hamilton, 961 F.2d at 1497-98. In Clifton v. Chater, the Tenth Circuit described, for purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence. Rather, in addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as the significantly probative evidence he rejects.

Clifton v. Chater, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) (internal citations omitted). If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed.

After "careful consideration of all the evidence" [AR 14], the ALJ denied Gutierrez's request for DIB. [AR 14-20.] Notwithstanding Gutierrez's post-onset work activity, the ALJ determined she had not been engaged in substantial gainful activity since December 15, 2005, the alleged onset date. The ALJ also found that Gutierrez had severe impairments in the form of degenerative disc disease and diabetes with associated vision loss. [AR 16.] The ALJ declined to find that Gutierrez's

5

allegations of depression constituted a severe impairment. [AR 16.] The ALJ further found that none of Gutierrez's impairments or combination of impairments met listing criteria, including her diabetes, vision loss, or back condition.  "After careful consideration of the entire record," the ALJ determined that Gutierrez had the residual functional capacity ("RFC") to perform light work except that she was restricted from more than frequent overhead reaching with her left and right arms and from occupations that would not accommodate corrected vision of 20/50 OD (right eye) and 20/70 OS (left eye). [AR 16-17.] The ALJ also found that while Gutierrez's impairments could reasonably be expected to produce the alleged symptoms, her statements regarding the intensity, persistence and limiting effects of the symptoms were not credible for a number of reasons. [AR 18.]

The ALJ decided that Gutierrez was not capable of returning to her prior relevant work as an LPN because that work is classified at a medium exertional level which exceeded her RFC.  [AR 18.]  Gutierrez was an individual "closely approaching retirement age," with at least a high school education. [AR 19.]  Considering all of the relevant factors, the ALJ found that Gutierrez had acquired work skills from her past relevant work that were transferable to the occupation of "companion," or to other occupations with jobs existing in significant numbers in the national economy. [AR 19.] In reaching his determination, the ALJ relied on testimony from a VE that was consistent with information in the Dictionary of Occupational Titles.  In addition, the ALJ concluded that Gutierrez's objective visual deficits were not sufficiently significant to impede the successful performance of work. [AR 19.] While her additional limitations did not allow Gutierrez to perform the "full range of light work," a finding of not disabled was appropriate under the framework of the grids. [AR 20.]

## IV.    MEDICAL HISTORY AND BACKGROUND

Gutierrez's medical records begin in late 2001 and continue through part of 2007.  The sole medical record from 2001 references complaints of musculoskeletal pain related to several motor vehicle accidents ("MVA") in which Gutierrez was involved.  In 2001, she was getting physical therapy, receiving trigger point injections, and having massages. [AR 249.] Gutierrez earned over $30,000 in 2001, while working as an LPN at First Choice in Los Lunas, New Mexico. [AR 50, 74.]

### *2002 Medical Records*

Gutierrez continued to work as an LPN through 2002, either at First Choice or with Los Lunas Community Program. [AR 74.]  She supplied five medical records from 2002.  In early 2002, she complained of vomiting for two days, dizziness, nausea, and high blood sugar levels.  She still suffered from upper back and neck pain and lower back pain.  Her Type 2 DM[11] was uncontrolled. [AR 234.] Several days later, Gutierrez complained of the same symptoms.  She was prescribed Insulin.  [AR 233.] In late January 2002, Gutierrez complained of heart flutters and palpitations. She was referred for a Holter monitor (ambulatory ECG monitor), but none of the medical records confirm that she used a Holter monitor, if she did, or what the results were from that testing. [AR 244.]  In late January 2002, Gutierrez's Insulin dose was increased.   Her problems of hyperthyroidism[12] and mild hypercholesterolemia[13] were still to be addressed. [AR 230.] On April

---

[11]Type 2 DM is one of two major types of DM.  Diagnosis is based on laboratory tests indicating glucose intolerance.  Dorland's Illustrated Medical Dictionary, 31st Ed., p. 513.

[12]Hyperthyroidism is a condition caused by excessive production of iodinated thyroid hormones.  Dorland's Illustrated Medical Dictionary, 31st Ed., p. 910.

[13]Hypercholesterolemia is characterized by excessive cholesterol in the blood.  Dorland's Illustrated Medical Dictionary, 31st Ed., p. 899.

22, 2002, Gutierrez weighed 174 pounds.  She requested muscle relaxants for neck and back pain. [AR 229.]

There are no additional medical records until April 2003.  Thus, it is not clear whether Gutierrez received any additional medical treatment for the year between April 2002 and April 2003.

### *2003 Medical Records*

In April 2003, Gutierrez had x-rays of her chest, shoulder and thoracic spine.  The chest x-ray was normal; the thoracic spine x-ray showed mild degenerative change; the left shoulder x-ray showed minimal degenerative change; and the right shoulder x-ray showed moderate degenerative change along with some spurring and sclerosis. [AR 242.] On April 23, 2003, Gutierrez was seen by a podiatrist because of her diabetes.  The podiatrist found she had a "pes planus" foot type (flat foot) with hammer digit syndrome.  She was diagnosed with DM with diabetic paresthesias (abnormal touch sensation), onychomycosis, and peripheral vascular disease (mild). [AR 227-28.] Gutierrez was at low risk to develop ulcers but was to follow up with a podiatrist for care. [AR 228.]

On April 24, 2003, Gutierrez reported a sharp, left-sided chest pain over the last 2½ days. The pain was not associated with dizziness, palpitations, shortness of breath, or weakness.  The medical note indicates Gutierrez was only taking Insulin when she felt her glucose was elevated. She had last checked her glucose two weeks ago.  The medical note further indicates her diabetes was under "poor control." [AR 149.]

On May 7, 2003, Gutierrez had a follow-up appointment with Dr. Ulibarri.  Her glucose level was still high.  She denied increased urination, thirst, or appetite.  She felt tired most of the time. As of this date, Gutierrez was working ten-hour shifts.  She complained of neck and back pain but the range of motion in the shoulder was all right. [AR 147.]

A medical record from May 2003 indicates Gutierrez had hepatitis in the 1980's, for which she was hospitalized in California. She currently was taking Insulin for diabetes and was to continue with the medication. [AR 225.]

Cervical, thoracic and spine studies of her neck and back were mostly normal in May 2003. There were some degenerative changes in the cervical, thoracic and lumbar areas, but no acute abnormalities were found. [AR 186.]

In June 2003, Gutierrez's glucose levels were better. [AR 146.] On July 21, 2003, she saw Dr. Noce and complained of a sharp pain in her right side that radiated to her back and right shoulder. [AR 145.] A surgical consult was performed that same day by Dr. Woods and gallbladder surgery was planned. More testing on Gutierrez's gallbladder was performed in July 2003. [AR 183.] On July 23, 2003, Gutierrez had an abdominal ultrasound for complaints of right upper quadrant pain. The conclusion was cholelithiasis[14] without evidence of cholecystitis[15] or biliary ductal dilation. A few small mobile stones were present in the gallbladder. [AR 183.] A nuclear medicine study was negative for acute cholecystitis or biliary ductal obstruction. [AR 181.] It appears from the records that Gutierrez had gallbladder surgery at the end of July 2003. [AR 144, 222.]

On August 13, 2003, Gutierrez reported she felt nauseated since the gallbladder surgery on July 31, 2003. [AR 144.] On October 8, 2003, she complained of neck and shoulder pain. Her blood pressure was high, and she had swelling. The doctor noted poor compliance for DM. He gave her trigger point injections for the pain, which helped. [AR 142.]

---

[14]Cholelithiasis is defined as the presence of formation of gallstones. Dorland's Illustrated Medical Dictionary, 31st Ed., p. 355.

[15]Cholecystitis is defined as the inflammation of the gallbladder. Dorland's Illustrated Medical Dictionary, 31st Ed., p. 354.

On November 4, 2003, Gutierrez was seen by Dr. Aragon for complaints related to her vision. [AR 198.] Dr. Aragon evaluated Gutierrez for ocular manifestation of diabetes as requested by Dr. Dan Dieterichs, who had noticed diabetic retinopathy.[16]  She complained of blurred vision; she had gained weight.  She suffered from an occasionally irregular heartbeat, numbness in her feet, and muscle aches.  She denied feelings of depression or anxiety.  Dr. Aragon found that Gutierrez had non-clinically significant diabetic macular edema.[17]  He recommended "observational management" at that point and a follow-up appointment in four months.  Dr. Aragon discussed with Gutierrez the benefits of glycemic control with respect to diabetes and ophthalmic manifestations. [AR 198.]

There are no medical records from early November 2003 until May 2004.

### *2004 Medical Records*

In late April 2004, Gutierrez complained of sinus pain, along with neck and shoulder pain after a MVA. [AR 141.] In May 2004, Gutierrez began physical therapy for neck and bilateral shoulder pain that had bothered her since 1989 when she was in a car accident.  She reported that she had had six MVAs.  She was rear-ended three times and broad-sided three other times.  The pain in her neck and shoulder was progressively worse with each accident.  At this time, Gutierrez was

---

[16]Diabetic retinopathy is defined as proliferative retinopathy associated with DM.  A less serious type is called background retinopathy.  A type that; often progresses to blindness is called progressive retinopathy. Background diabetic retinopathy is characterized by progression of microaneurysms, intraretinal punctate hemorrhages, cotton-wool spots and sometimes macular edema that can compromise vision.  Dorland's Illustrated Medical Dictionary, 31st Ed., p. 1659.

[17]A complication of diabetic retinopathy consisting of swelling of the retina due to leakage of fluid from adjacent blood vessels.  The result is blurring in or next to the center of the visual field, which can progress to blindness.  Dorland's Illustrated Medical Dictionary, 31st Ed., p. 600.

working as an LPN at Los Lunas Community Center.  She took oral Glucotrol[18] and Lisinopril[19] but no pain medications.  X-rays showed degenerative disc disease throughout the spine, but the MRI was negative.  Gutierrez's diabetes and hypertension were controlled at this time through medication.  She reported that pain limited her ability to work, including her ability to reach upwards.  She had difficulty washing her hair and reaching her back in the shower.  The pain interfered with her sleep.  Her neck and back range of motion were sometimes quite reduced. [AR 216-17.]

On June 16, 2004, Gutierrez received physical therapy again and reported she was feeling better and could do more.  She had a painful elbow.  The therapy notes indicate Gutierrez was doing "quite well." [AR 215.]

On June 18, 2004, a thyroid uptake and scan were performed, indicating that there was a solitary hyperfunctioning nodule on the lower right lobe of the thyroid.  She was referred to a specialist. [AR 177.]   On July 23, 2004, Dr. Ferraro saw Gutierrez for the hyperfunctioning thyroid nodule.  She had some swelling in the right side of her neck.  Lab values indicated hyperthyroidism.  Gutierrez had gained 10 pounds over the last hear.  At this time, Gutierrez was taking Lisinopril and Glucotrol.  Dr. Ferraro planned to proceed with radioactive iodine ablation (removal or eradication) of the thyroid nodule.  [AR 209-10.]

On July 27, 2004, Gutierrez saw Dr. Noce, complaining of abdominal pain.  She felt somewhat better but still had some flank pain. [AR 139.] On August 6, 2004, Dr. Noce noted that

---

[18]Glucotrol or "Glipizide is an anti-diabetic drug (sulfonylurea-type) used along with a proper diet and exercise program to control high blood sugar. It is used in patients with type 2 diabetes (non-insulin-dependent diabetes). It works by stimulating the release of your body's natural insulin."  www.webmd.com

[19]This drug belongs to a group of medications called ACE inhibitors. It is used to treat high blood pressure (hypertension) in adults. It works by relaxing blood vessels, causing them to widen.  www.webmd.com

Gutierrez previously was treated with radiation of the thyroid nodule.  She was very fatigued.  She had "self-stopped" Lantus,[20] the diabetes medication.  She was to restart Lantus and follow up with Dr. Ferraro.  [AR 138.] On August 16, 2004, she saw Dr. Noce again and complained of chest pain and palpitations.  She had appointments with a cardiologist and with Dr. Ferraro. [AR 137.]

On August 19, 2004, Gutierrez saw Dr. Ferraro.  Her problem list included hyperthyroidism, secondary to toxic unindular thyroid, Type II DM, chronic complications, diabetic retinopathy, HTN, "tachycardia, quiescent."  Gutierrez reported she was feeling well since the thyroid treatment on July 29, 2004. [AR 208.]

On August 30, 2004, Gutierrez saw the cardiologist, Dr. Palmer.  The medical record notes that she had adult onset DM, diagnosed in 1989, hyperlipidemia, elevated LDL cholesterol, HTN, a family history of premature coronary disease, and a recent diagnosis of hyperthyroidism with a hyperactive nodule.  At this time, Gutierrez worked with the developmentally disabled for the State of New Mexico. She stated she had been in her "usual health" until two weeks ago when she noticed extreme fatigue at work. [AR 204.] She went to bed and then felt severe left neck pain.  She also had sharp pains under her left breast.  Gutierrez was taking Lisinopril, Glucotrol, baby Aspirin, Vitamin B, and Lantus Insulin.  Her EKG was normal.  However, the doctor believed she "presented with a complex" that represented underlying angina and ischemic heart disease.  She was set up promptly for a cardiolite stress test, a lipid profile and a liver panel.  Dr. Palmer described Gutierrez as "delightful and intelligent." [AR 204-06.]

---

[20]"Insulin glargine is used along with a proper diet and exercise program to control high blood sugar. It is used in people with type 1 (insulin-dependent) or type 2 (non-insulin-dependent) diabetes. Insulin glargine is a man-made, long-acting type of insulin that is similar to human insulin. It starts working more slowly and lasts for a longer time than regular insulin."  www.webmd.com

In early September 2004, stress tests were performed. Her "resting ECG was normal." The stress ECG showed non-significant "ST changes" but not ischemia. The overall quality of the study was poor due to significant uptake in the GI tract. [AR 203.] Prone imaging was obtained that indicated complete normalization of the anterior wall except for a very minimal area. There was no significant ischemia.

On September 14, 2004, Gutierrez again saw Dr. Aragon for a vision appointment. She was "six months status post laser grid photocoagulation[21] OD [right eye]." She felt like there was cotton in her right eye, but felt the left eye was doing well. Her blood sugars were well controlled at this time. [AR 195.] Dr. Aragon noted some re-accumulation of fluid in the right eye and proceeded with a fluorescein angiography and "OCT" that day. [AR 195.]

On October 4, 2004, Dr. Aragon planned to proceed with further laser grid photocoagulation of Gutierrez's right eye and initiation of laser grid photocoagulation in the left eye. [AR 196.] The diagnoses were BDR (background diabetic retinopathy) OU (each eye) and macular or retinal leakage OU.

On November 10, 2004, Gutierrez was seen by Dr. Noce for feelings of light headedness, fatigue, nausea, and palpitations. She was to start Lantus Insulin again. Gutierrez had not worked for five days. [AR 136.] On November 18, 2004, Gutierrez had been off work for ten days. She had cold symptoms and also requested a colonoscopy. [AR 135.] On November 23, 2004, Gutierrez still complained of cold symptoms, shortness of breath, and back pain. She had "self-stopped" Glucotrol" because her blood sugars did not drop with the medication. She was having night sweats but no fevers. The doctor noted she had insulin dependent DM with retinopathy. [AR 134.]

---

[21]Photocoagulation is condensation of protein material by the controlled use of an intense beam of light. Dorland's Illustrated Medical Dictionary, 31st Ed., p. 1460.

13

### *2005 Medical Records*

Through early 2005, Gutierrez continued to complain of a cold or sinus infection. She had not yet gone for a colonoscopy. [AR 132, 133.] On May 23, 2005, she reported rectal bleeding and hemorrhaging. She had a family history of colon cancer. This record also notes that Gutierrez "self-stopped" Lisinopril. [AR 131.]

In June 2005, Gutierrez had a CT scan of the abdomen for complaints of rectal bleeding and right lower quadrant pain. The results showed there might be a few scattered diverticula but no evidence of diverticulitis. She had a simple cyst on the left kidney. [AR 175.] On June 14, 2005, Gutierrez reported the HTN was controlled through medications. Her liver function test was normal. She was taking Levothyroid for hyperthyroidism. She was also taking Lisinopril every other day and Lantus Insulin on a sliding scale. She suffered from occasional swelling of the feet, occasional heart palpitations, and shortness of breath. Gutierrez also reported weakness in her extremities, depression, and insomnia. The medical record indicates she weighed 191 pounds. She had rectal bleeding that began in May 2005, and was scheduled for a colonoscopy. [AR 189-191.]

On August 31, 2005, Dr. Mason performed a colonoscopy. She had normoctyic anemia[22] with normal iron stores. Subjectively, Gutierrez stated she was feeling quite well. She recently had spent quite a bit of time visiting a convent near Juarez, Mexico, which she was thinking of joining. The bleeding and dysphagia (difficulty swallowing) appeared to be resolved. She believed those problems were caused by dehydration. Currently, Gutierrez was taking Lantus on a sliding scale, Lisinopril, baby Aspirin, Synthroid, and Iron supplements. There were three negative hemoccults

---

[22]"Normocytic anemia is anemia with erythrocytes of normal size but a proportionate decrease in hemoglobin content, packed red cell volume, and number of erythrocytes per cubic millimeter of blood." Dorland's Illustrated Medical Dictionary, 31st Ed., p. 80.

from early August.  She still had mild normocytic anemia but this was better.  Her iron stores were normal.  The CT scan performed in June was interpreted as normal.  Both an EGD and a colonoscopy were performed, given the anemia.  The colonoscopy was normal.  The upper endoscopy showed grade 2 erosive esophagitis and a small hiatal hernia.  A biopsy was taken of the distal esophagus to rule out Barrett's esophagus, and she had an empiric dilation.  The histology results from the descending duodenum were normal.  The biopsies were normal.  "All in all reassuring studies with no significant bleeding sites."  Gutierrez did not need to take iron due to her adequate "iron stores."  [AR 187-88.]

Although Gutierrez appeared to be doing well at the end of August 2005, she alleged an disability onset date of December 15, 2005. [AR 59.]

### *2006 Medical Records*

Gutierrez saw Dr. Noce on January 6, 2006.  She was very stressed and not taking the Lantus daily.  She also was not taking Glucose daily.  Dr. Noce directed her to re-start her prescriptions. [AR 129.]

On February 2, 2006, Gutierrez filed for DIB.  In a face-to-face interview, the disability services personnel observed no problems, except that Gutierrez had difficulty seeing where to date the form. [AR 120.] As of February 11, 2006, Gutierrez was receiving retirement benefits in the amount of $897.00 per month. [AR 46.]

On March 1, 2006, Gutierrez filled out a Vision Screening Report for DDS. [AR 80.] She had "floaters" in her eyes, blurred vision and burning in her eyes that was worse at night.  She was unable to read at night.  She had difficulty seeing traffic signs when she drove.  She could not see well at night but was able to drive better during the day.  She could not read the print in a newspaper because her vision was too blurry.  She could not watch TV or see what was printed on a computer.

Gutierrez wore glasses.  She said her vision had been worse over the last six months.  She previously had received laser treatment from Dr. Aragon. [AR 80.]

On March 1, 2006, Gutierrez also filled out an adult function report for DDS. [AR 99.] Her daily activities included praying, going to church, preparing breakfast, talking with friends and family by telephone, cooking lunch, taking a nap, and cleaning the house. [AR 99.] She claimed she was involved in six different MVAs since 1988.  Gutierrez could not hold up her arms in front of her for more than five minutes.  She had no strength.  She had neck, shoulder, leg, and lower back pain.  She had occasional headaches. [AR 100.] Her pain was always present.  She spent 15 minutes a day cleaning and two hours a week doing laundry.  Gutierrez was unable to stand, walk or sit for long.  She could walk one block and pay attention for two hours.  She went outside one or two times a day.  Gutierrez could drive a car, shop, and take care of her finances. [AR 102.] Her hobbies were church, visiting friends, reading, and family research.  However, she could not read well due to blurred vision.

There is an undated typed form that states Gutierrez's hands and feet were numb and painful since the last disability report. [AR 108.] She was constantly in pain but could not take pain medications due to gastric erosion.  Gutierrez was tired and very depressed.  She could not sleep well and was constantly fatigued. [AR 108.] At this time, Gutierrez was taken aspirin for her heart, fish oil for diabetes, Glucosamine for pain, Glybiride for DM, Insulin Lantis for DM, krill oil for pain, Lerclanate as an enhancer for diabetic medications, Lisinopril for blood pressure, Niacin for her heart, Prilosec for stomach problems, and Synthroid for thyroid problems. [AR 111.] She stated she was diabetic and had lost some of her vision due to diabetic complications, had kidney problems, neck and back pain from MVAs, anemia, and high blood pressure.  Her vision was getting worse and more blurry; she had floaters.  She was anemic and tired all of the time.  Although many of these

16

problems first bothered her in 1989, she was able to work at least until December 15, 2005 [AR 113.]

An April 25, 2006 x-ray of her spine showed multilevel degenerative disc changes with a potential bony canal impingement at C5-6. [AR 314.]

On May 1, 2006, Dr. Richard Sonntag performed a consultative vision examination for DDS. [AR 311.] He noted that Gutierrez was taking Lantos Insulin and Glybiride. She had received some treatment from Dr. Aragon in 2004 for retinopathy. A complete eye exam was performed. Dr. Sonntag found that Gutierrez's visual fields were nearly normal. Her corrected distant vision was 20/30 in O.D. and 20/40 in O.S. There was minimum background diabetic retinopathy with a suggestion of diabetic macular edema. [AR 312.] There were random laser scars. Some focal leaks were suggested. She believed she had Graves Disease but Dr. Sonntag found no such evidence. He recommended she have a dilated retina exam every six months for diabetic retinopathy. On May 15, 2006, Dr. Sonntag described her exam as being "almost a normal eye exam with the exception of mildly reduced visual acuity, myopia with astigmatism and presbyopia and background diabetic retinopathy OU." [AR 310.]

On May 10, 2006, Dr. Stephen Vaughn performed a consultative physical examination for DDS. [AR 304.] He noted Gutierrez's chief complaints as vision loss and pain. He found that Gutierrez's oral history was "fair." He reviewed her information and medical records, noting she had diabetes "for several years." Actually, she was diagnosed with diabetes in the late 1980's. Dr. Vaughn wrote that Gutierrez could drive and believed she could do so safely. He noted that she had been in six MVAs, and had chronic neck pain, along with generalized pain in her arms, hips, legs, and trunk from the accidents. She was not taking medications for arthritis although she had arthritis. She believed she could walk several blocks and stand for 15 minutes. She was not limited in her

17

ability to sit, do chores, dress, or prepare food.  Dr. Vaughn observed that her neck ROM was very restricted for reasons that were unclear to him.  Her shoulder ROM was somewhat limited bilaterally.  Her cervical spine was very limited when she turned her head.  Her lumbar spine was limited to 20 degrees bilaterally from pain. [AR 308.] However, Dr. Vaughn did not find any significant functional disability, i.e., there were no limitations as to her ability to lift, carry, walk, stand, sit, or handle objects. [AR 309.]

On June 1, 2006, Dr. Bocian performed an RFC assessment.  Diabetes was Gutierrez's primary diagnosis and degenerative disc disease of the cervical and lumbar spine was the secondary diagnosis.  She also had diabetic retinopathy. [AR 296.] The non-examining physician concluded Gutierrez could lift or carry less than 20 lbs. occasionally and less than 10 lbs. frequently.  She could sit, stand or walk for six hours.  She was limited in the ability to push and pull. [AR 297.] Dr. Bocian explained that because there was no recent treatment documented in the last 12 months, the DDS ordered two consultative examinations.

Dr. Bocian found that Gutierrez was limited in the ability to reach in all directions because of her restricted shoulder ROM. [AR 299.] The visual consultative exam showed that Gutierrez had "mildly reduced visual acuity" and limitations in near and far acuity and in field of vision. [AR 299.]

Dr. Bocian's physical limitations were significantly different than those found by Dr. Vaughn. [AR 302.] Dr. Bocian noted that Dr. Vaughn opined Gutierrez had no significant functional limitations with respect to lifting and carrying and no functional limitations in handling objects.  Dr. Bocian, however, observed that the objective clinical findings showed limited ROM in the cervical and lumbar spine as well as some limitations bilaterally in the shoulders.  Dr. Bocian described diagnostic imaging or cervical x-rays that showed significant medical findings that would restrict

18

Gutierrez's ability to lift and carry more than 20 pounds frequently and 10 pounds occasionally, and that would also restrict her ability to engage in frequent overhead reaching bilaterally. [AR 302.]

In early June 2006, Gutierrez's initial claim for DIB was denied. [AR 25, 42.]

On July 2, 2006, Gutierrez filled out another adult function report. [AR 81.] This report, filled out four months after an earlier report in April 2006, reflects more significant subjective complaints. She stated she slept "fitfully" during the night, awakening between 1:30 a.m. and 5 a.m. She then slept until 11 or noon. She fixed something to eat and returned to bed until 2 p.m. She took a nap until 5 p.m. and went to bed at 8:30 p.m. Gutierrez was able to water the plants every three days but it was very tiring. She used to have a pet parrot but she gave it to her sister because it required too much work. [AR 82.] Gutierrez used to cook a lot, decorate cakes and keep her house spotless but was no longer able to do these things. She used to read but could not read now. She spent most days in her pajamas. Sometimes she did not bathe for 3-4 days. She could go out alone and drive short distances in the day. [AR 84.] She shopped 1-2 times a month. She was not interested in any of her prior hobbies. She was tired of people taking advantage of her and found that people upset her. She stated she could lift only 10 pounds, stand for 15 minutes, and sit for an hour. She could walk one city block but needed to rest 15-20 minutes. Gutierrez was unable to handle stress and did not like change. She kept her telephone disconnected because she did not want people to bother her. [AR 88.]

On July 4, 2006, Gutierrez's sister, JoAnn Sanchez, filled out a third party function report. This report and Gutierrez's July report are virtually the same. [AR 89.]

On August 2, 2006, Gutierrez filed a request for reconsideration, stating she could not sustain employment "due to advanced age, severe physical and mental impairments." On October 18, 2006, the SSA denied the request for reconsideration, noting that there was no new evidence. [AR 23, 33.]

There are no medical records for the remainder of 2006, with the exception of some counseling records in December.  It appears from the counseling records that there was a fire in Gutierrez's sister's house in early December and that Gutierrez was present.  Gutierrez was burned in the hands and face.  Her parrot was burned to death. [AR 250.]

When Gutierrez attended her first counseling session on December 11, 2006, she appeared disheveled and her mood was flat.  Her energy was low. [AR 250.] She was diagnosed by the social worker with "major depression d/o recurrent and bereavement."  She had a limited support system with a history of depression.  She had "retired early" and had lost interest in things, including friends.  She reported she was "forced into retirement," and also said she quit her job in April 2006. During the ALJ hearing, Gutierrez was uncertain about when she last worked, stating she thought it was in January 2006.

A counseling record or assessment, dated December 14, 2006, noted that Gutierrez was experiencing depression that was exacerbated by leaving her job.  She was isolating, not eating, sleeping most days, and feeling hopeless. [AR 256.] She lived alone and had been divorced three times.  She had a past history of assaultive incidents and was a domestic violence victim. [AR 258.] She needed help since the trauma of the fire.  She had no significant health problems, according to this form. [AR 259.  She was "in good health except for DM." [AR 259.] She presented, however, with a blunt affect.  She had poor self esteem and made up for it by over-helping others.  She was strong-willed and independent. [AR 264.] She had a history of depression and had symptoms of depression "most of her life."  But, she was involved in her work and able to overlook the symptoms.  She "retired six months ago and became more depressed as exhibited by socially withdrawing, sleeping most of the day and feelings of hopelessness."  The social worker concluded Gutierrez was impaired in social, familial, educational and occupational functioning based on this

interview. [AR 264.] Gutierrez had not obtained any psychiatric help before this time.  The social worker assessed her with some moderate limitations, based on one interview. [AR 264, 265, 272.]

### *2007 Medical Records*

Gutierrez attended two more counseling sessions in 2007.  The January 11, 2007 counseling record indicates she was seen twice since the home fire and appeared to be doing well.  This record further notes that Gutierrez had just obtained a job at a Catholic retreat and would be selling her house.  She was living on her retirement after having stopped working one year ago. [AR 275.]  On April 2, 2007, Gutierrez was seen again for counseling.  She was having passive thoughts and wishful thinking of not waking up.  Her housing was unchanged, and her interpersonal relationships had worsened.  Nothing medically had changed.  She had to move to a retreat house for part time work and quit recently. [AR 277-78]  She was assessed as having a few moderately severe symptoms, including a blunt affect and being emotionally withdrawn.  She had limited coping skills and was not stable. [AR 279, 282.]

On June 22, 2007, Gutierrez saw Dr. Noce.  The medical notes indicate she retired in February 2006, and had been ill for nine months.  She stopped some of the prescribed medications on her own.  She could not afford her medications.  Her car was not working, and she would need to sell her home.  She had seen an eye doctor.  Her diagnoses were DM, HTN, mild retinopathy, and hypothyroidism [sic?].  Her prescriptions were refilled, but she could not afford lab work. [AR 128.]

On October 8, 2007, Gutierrez saw the doctor for a tetanus shot after stepping on a nail.  The medical note indicates she recently had walked a long distance, and her foot pain had increased.  She had an infected blister on her right foot. [AR 127.]

On November 13, 2007, the ALJ hearing was held, at which Gutierrez was represented by a non-attorney. [AR 14, 324.] Gutierrez's representative noted that not all of the medical records

were before the ALJ.  Thus, she was given additional time to submit Dr. Noce's and vision medical

records.  The ALJ asked about Gutierrez's ability to drive.  She stated she drove very little, perhaps

to church or the grocery store once or twice a week.  Her vision was very poor which interfered with

safe driving.  [AR 328.]  She was told she was getting cataracts in her eyes and that she had

hemorrhaging and swelling in her eyes because of DM.  [AR 328.]  She also testified she had had

laser surgery to stop the hemorrhaging two years ago.  [AR 329.]  She was certain that DM was the

cause of her eye problems.  She could not say how often she had hemorrhaging now; she noticed

only blurred vision.  She had gone to the ophthalmologist in January 2007, but there was no record

of the visit from Dr. Dieterichs' office.  While Dr. Dieterichs' office acknowledged they had seen

Gutierrez in January, they could not locate the file.  [AR 331.]

Gutierrez also complained of depression that was not necessarily related to her other health

problems.  She believed her depression stemmed from the house fire that occurred last year.  [AR

331.]  She had been seeing a counselor up until June but no longer could afford counseling.  [AR

331.]  As of June, she had been encouraged to get out of the house more and to take some classes in

painting.  However, she stated she could not distinguish colors.  She had obtained new glasses in

January but could not see out of them.  She was supposed to see Dr. Dieterichs in a few days and

would supply that report. [AR 332.]  She also claimed she suffered first and second degree burns on

her hands and face from the house fire in December 2006, but there are no corresponding medical

records regarding treatment of the burns.

Gutierrez testified that her DM was controlled off and on.  She described it as having been

"very well controlled since November 2006." [AR 333.]  She tested her blood sugars regularly.

While she had been on Insulin she no longer needed it because she was able to control her DM

through diet.  [AR 334.]  She believed she had taken Insulin for about two years but had stopped

taking it in November 2006, because it made her sick, she could not eat, she was vomiting and falling, and she was staying in bed most of the time. [AR 334.] Dr. Noce told her to continue with other diabetes' medication and approved the decision to quit Insulin in November 2006. [AR 334.] There are no corresponding medical records to confirm this.

Gutierrez had seen Dr. Noce as recently as one month ago but no longer could afford to see him as much. Gutierrez reported she had suffered from hepatitis in the past but there were no signs of it now. [AR 336.]

The ALJ noted that without the most current and complete vision records, he would have to guess at the RFC regarding her vision. Gutierrez last worked as an LPN in February 2006, but had to quit because she could no longer read the computer screen. [AR 337.] The ALJ noted Dr. Sonntag's examination of Gutierrez's vision in May 2006. The CE found that Gutierrez had an "almost normal eye exam" then, with the exception of mildly reduced visual acuity and myopia with astigmatism. [AR 338.] Gutierrez described the CE's exam as very thorough.

The ALJ stated he did not know how to formulate the RFC for vision without the necessary medical records. [AR 343.] However, he formulated the RFC based on the CE's examination record. [AR 343.] The VE testified that a licensed vocational nurse worked at a medium exertional level, was semi-skilled, "number 4, svp 4." [AR 345.] Gutierrez had performed that work for almost thirty years. [AR 346.] There was a four-five year gap in earnings when she worked for the VA, when no deductions for social security were made. [AR 346.] Gutierrez believed she had worked through part of January 2006 but had to quit that job because of her inability to read computer records. [AR 348.]

The ALJ presented a hypothetical to the VE, asking him to assume that Gutierrez could lift 20 pounds occasionally and 10 pounds frequently, that she could sit, stand and walk for six hours. She was limited in her upper extremities. The ALJ left out any vision limitation because he did not

have enough information. [AR 348-49.] He did not include any mental issues/limitations because he did not have any objective evidence to substantiate mental limitations. Gutierrez's representative reminded the ALJ that the counseling records had been provided. [AR 349.] The ALJ reviewed those records.

The VE testified that Gutierrez could not perform her past relevant work because she could not do medium exertional work under the hypothetical. [AR 350.] She did, however, have transferable skills, including practice in taking vital signs, dispensing medications, recording and charting, carrying out doctors' orders, and caring for patients. [AR 350.] The VE testified that these skills would transfer to work as a "companion," which is light work and semi-skilled, "number 3." The companion job was discussed at length, at which point Gutierrez asked the ALJ how she could perform this job if she was unable to drive. She testified she could not see the white lines on the road. [AR 355.] She also was unable to see directions on medicine bottles. The ALJ explained that this was a "tentative RFC" because he did not know what her vision limitations were without additional records. The ALJ intended to keep the record open for additional medical records and to conduct a supplemental hearing as needed.

On November 19, 2007, Dr. Dieterichs wrote a letter to the ALJ. He had seen Gutierrez on November 14, 2007. She complained then of decreasing vision in both eyes. Her best corrected visual acuity was 20/50 OD and 20/70/ OS. Her pupils were normal. Cataract formation was observed in both eyes. The increasing cataracts caused glare and made it difficult for Gutierrez to discern colors and to drive. She also suffered from diabetic retinopathy which caused a distortion in the retina that adversely impacted her vision. She was referred to see a retina specialist for diabetic retinopathy. [AR 123.]

On November 27, 2007, Gutierrez's representative supplied Dr. Dieterichs' letter/report and current Rio Abajo Family Practice records to the ALJ, including 2007 records. [AR 122.]

On December 11, 2007, Gutierrez provided a typewritten letter to the ALJ stating that since he focused mostly on her vision problems at the hearing, she had not mentioned other health conditions. In this letter, Gutierrez discussed kidney problems, numbness in her fingers and feet, pain and cramping in her legs, restless leg syndrome, dizziness, nausea, heart palpitations, high blood pressure, pain in the jugular veins, swelling in her feet, fatigue, depression, dry skin, acid reflux, diarrhea, arthritis, elevated cholesterol, body pain from six MVAs, severe headaches, muscle spasms, and insomnia. [AR 68-72.] She further stated she received social security and $32.00/month in food stamps. She had worked for fifty years since she was 13 years old. She claimed her "body is tired and burned out, I can't push it anymore." [AR 72.]

## V.   DISCUSSION

### A.   Alleged Legal Error

Gutierrez argues that the ALJ committed three errors in denying Gutierrez's application for DIB: (1) the ALJ RFC finding was not supported by the record; (2) the ALJ's conclusion that Gutierrez was not disabled at step five, in reliance on the VE testimony, was contrary to the evidence; and (3) the ALJ's reliance on the physical consultative examination was error. [Doc. 15.]

### B.   RFC Finding

The Court focuses on Gutierrez's position that the ALJ's reliance on the VE's testimony was erroneous or contrary to the evidence.[23] At the hearing, the ALJ provided a hypothetical question

---

[23]Based on the Court's decision to remand this matter for additional administrative proceedings, the Court does not address Gutierrez's additional argument that the ALJ committed error by not including Gutierrez's mental health symptoms in his analysis. [*See* Doc. No. 15, p. 8.]

to the VE but was unable to include any limitations as to Gutierrez's vision impairments because the most current vision records were not yet part of the administrative record. Gutierrez argues that it was improper for the ALJ to rely on the VE's response to a hypothetical that omitted the vision impairments. [Doc. 15, p. 9.] Gutierrez further asserts that in order for the ALJ to rely on the VE's testimony and for the VE's testimony to constitute substantial evidence supporting the denial of evidence, the information provided to the VE must accurately reflect all of the claimant's impairments. *See* Hargis, 945 F.2d at 1492.

After the ALJ hearing concluded, Gutierrez supplied the ALJ with her most current vision records from Dr. Dieterichs. Based on that record and medical information in the administrative record, the ALJ stated in his written opinion "I do not find that Ms. Gutierrez's objective visual deficits are significant enough to impede the successful performance of such work." [AR 19.] Gutierrez asserts that the ALJ's written finding is beyond his role as an adjudicator and that he overstepped his bounds when he made this finding.

In addition, Gutierrez argues that reliance on the physical consultative examination by Dr. Vaughn was error because Dr. Vaughn's medical report contained a number of inaccuracies. Thus, according to Gutierrez, Dr. Vaughn's opinions are not substantial evidence to support the RFC finding for light work. [Doc. 17.]

The Commissioner responds that the ALJ properly considered Gutierrez's vision impairments by addressing the vision report of consultative physician, Dr. Sonntag, who found that Gutierrez had "an almost normal eye exam," with some exceptions. Moreover, the Commissioner asserts that Dr. Dieterichs' later examination of Gutierrez was consistent with Dr. Sonntag's findings and that Dr. Dieterichs did not find that Gutierrez's vision deficits affected her ability to engage in a full range of daily activities, including working and driving. "It is significant that, despite Dr.

Dieterichs' findings, he did not restrict her activities." [Doc. 16, p. 7.] Thus, it is the Commissioner's position that because the visual impairment allegedly did not impact Gutierrez's ability to work, it was not necessary to include it the hypothetical to the VE.

The Commissioner further argues that the ALJ properly relied on Dr. Vaughn's assessment that Gutierrez had no functional limitations and on a single medical record noting that Gutierrez had walked "a long distance" in October 2007. [Doc. 16, p. 4.] According to the Commissioner, Dr. Vaughn's examination and assessment are substantial evidence supporting the RFC finding.

C.    Analysis

First, the transcript of the ALJ hearing is notable for statements by the ALJ as to his uncertainty and confusion regarding Gutierrez's visual impairments.  For example, he states:

> Now what?  We know she has some vision issues.  The DDS notes the visual limitations, but then doesn't – they note the – her myopia and blah, blah, blah.  I've got that, too.  It is – it can be corrected. The problem is it says – and I'm just quoting here – possible diabetic macular edema was present as well as random laser scar suggestive of focal argon laser photocoagulation treatment, whatever that means. Circular and semicircular heart exudat, e-x-u-d-a-t, [sic] suggested focal leaks were also present.  Ma'am, to your – besides the – what was the name – Dr. Dietrich [sic], have you had any other eye examinations or anything?

[AR 332.] The ALJ adds:

> I don't know about you, but boy, I sure am real curious to know what that problem is because if it's a chronic problem that can't be fixed and it's getting worse, then the rest of this stuff sort of goes away in the sense that it's irrelevant.  I mean if you've got – if your vision is that bad or if it, you know, if it –

[AR 332-33.] Later, the ALJ notes:

> See, the position that puts me in is I'm having to guess here what the RFC may be with respect to her vision.  Boy.  Okay, let's see what you usually do here.  Okay. . . .

27

[AR 337.]

> . . . . The problem I now find myself in is I don't know what – how to formulate the RFC with respect to her vision, so you've –
>
> . . .
>
> Here's what I'm going to do. . . . I'm going to use the – I'm going to – because we don't know what the vision problem is.  I mean I've got one doc saying no problems, but there – well, let me rephrase that.  He's saying, almost normal, not quite, there's some problems.  I don't know what the vision problems are, so I think the easiest way to proceed is, I'm just going to go ahead and give the RFC to the VE and I'll just ask him.  Now, sir –

[AR 343.]  The ALJ formulated a hypothetical for the VE but omitted any field of vision issues "because I don't know anything about that at this time." [AR 349.] The hearing continued with a discussion of Gutierrez's possible physical limitations, the transferability of skills, and whether she could perform the duties of a "companion."  After a lengthy discussion about the duties of a companion, Gutierrez interrupted and asked how she could do this job if she could not see the lines on the road well enough to drive.  She asked how she could accurately dispense medications to a person if she was unable to read the labels on the bottles. [AR 334-35.] While Gutierrez raised a concern about dispensing medication if she could not see, her concerns apply equally to taking and charting all information routinely performed by the hypothetical "companion." [AR 350.] The ALJ then responded that this was a "tentative RFC."  He reiterated that he did not know what the eye problems were.  "I feel I'm operating in the unknown right now, but I got to work with what I got." [AR 356.]

After receipt of the most recent November 2007 vision report from Dr. Dieterichs [AR 123], the ALJ did not hold a supplemental hearing.  Instead, he issued a written decision discussing Dr. Dieterichs' findings of corrected visual acuity (20/50 OD and 20/70 OS), Gutierrez's increasing

cataracts, and retinal distortion.  The ALJ stated "[t]o be sure, the evidence supports some degree of vision loss: her corrected sight is limited to 20/50-20/70.  She has bilateral cataracts but cataracts are ordinarily correctable."  He further wrote: "[c]ataract surgery is today a routine procedure and should be expected to improve her eyesight." [AR 18.] Finally, the ALJ concluded that he (the ALJ) "[did] not find that Ms. Gutierrez's objective visual deficits are significant enough to impede the successful performance of such work [that of a companion]." [AR 19.] He made little or no mention of her diabetic retinopathy, reduced visual acuity, myopia with astigmatism or presbyopia. [AR 310.]  Instead, he emphasized Dr. Dieterichs' findings that her "pupils wee normal," her "confrontation fields were normal," and her "extraocular muscle function was normal." [AR 17.] It is impermissible for an ALJ to "pick and choose" favorable portions of medical records, while ignoring other less than favorable parts of the record.  *See* Robinson v. Barnhart, 366 F.3d 1078, 1083 (10th Cir. 2004) (*per curiam*) ("The ALJ is not entitled to pick and choose from a medical opinion, using only those parts that are favorable to a finding of nondisability.").

Here, it is clear that objective medical evidence supports Gutierrez's allegations of some visual impairment(s).  However, the ALJ provided no information of visual impairments to the VE because the ALJ was unclear what visual impairments she had at that point.  Thus, the VE did not formulate his opinion based on the medically documented visual impairments.  Notwithstanding the incomplete hypothetical presented to the VE, the ALJ relied on the VE's testimony at step five in finding Gutierrez not disabled. [AR 19.]  In order for the VE's testimony to constitute substantial evidence supporting the ALJ's decision, the information provided to the VE must accurately reflect all of Gutierrez's impairments.  Hargis, 945 F.2d at 1492 ("[T]estimony elicited by hypothetical questions that do not relate with precision all of a claimant's impairments cannot constitute

29

substantial evidence to support the [Commissioner's] decision.") (quotation omitted).  Such was not the case here.

Instead of re-formulating a hypothetical to the VE at a supplemental hearing, the ALJ summarily found that Gutierrez's objective visual deficits were not significant enough to prevent her from performing the occupations identified by the VE. [AR 19.]  This amounts to a medical opinion; however, there is neither objective medical evidence nor testimony from the VE to support such a finding.  The Commissioner's argument that Dr. Dieterich did not find any visual restrictions is unconvincing when Dr. Dieterich was not asked about restrictions.  The ALJ may not substitute his opinion for that of a doctor, nor may he usurp the role of the VE.  The Court determines that the ALJ overstepped his bounds into the province of medicine when he made findings regarding the effects of Gutierrez's visual deficits.  *See* Miller v. Chater, 99 F.3d 972, 977 (10th Cir. 1996).

The same is true regarding the ALJ's remarks that Gutierrez's cataracts could be corrected by routine surgery that "should be expected to improve her eyesight." [AR 18.]  Again, the ALJ offered medical opinions with respect to Gutierrez's condition, and how surgery would resolve her condition.  Yet Dr. Dieterichs, the vision specialist, did not recommend cataract surgery to improve Gutierrez's condition, nor did he offer any prognosis if a surgical procedure were performed.  Instead, Dr. Dieterichs noted that her situation was complicated by diabetic retinopathy that required a referral to a retina specialist. [AR 121.] The ALJ's opinion regarding cataract surgery does not take into account the effects of Gutierrez's undisputed diabetic retinopathy, nor could it because the ALJ is not in the position to render medical judgment.

Because the Court concludes that the ALJ's RFC and step five findings were not supported by substantial evidence, it will grant Gutierrez's motion and remand for additional administrative

hearings to allow the ALJ to reassess Gutierrez's RFC and to re-formulate the hypothetical to a VE, as needed.

In addition, upon remand, the Court recommends that the ALJ order another physical consultative examination of Gutierrez to determine the pertinent physical limitations, if any.  The Court is concerned with the ALJ's reliance on Dr. Vaughn's May 2006 consultative examination because of clear errors or misstatements in the consultative physician's report.  For example, Dr. Vaughn reported that Gutierrez was 55 years old rather than her true age of 63. [AR 304, 342.] After reviewing Gutierrez's physical condition, he reported "negative" next to "Endocrine," notwithstanding the longstanding diagnoses of DM and hyperthyroidism,[24] both of which relate to the endocrine system.  Thus, the report is in conflict with Gutierrez's medical history.  Dr. Vaughn noted that Gutierrez "has diabetes for several years . . . . ," a statement that implies a relatively recent diagnosis.  However, Gutierrez has been an insulin dependent diabetic for years and was diagnosed with DM in the late 1980's.

Moreover, the following two statements by Dr. Vaughn appear inconsistent at best:

> She does drive, and does not believe that her visual impairment is to a degree to prevent her from driving safely.  She has been in six motor vehicle accidents, and has chronic neck pain, and generalized arm, hip, leg, and truncal pain from these accidents.

[AR 304.] Finally, it is not certain whether Dr. Vaughn reviewed the cervical x-rays taken in April 2006, based on his notation that she had "very restricted range of motion" in her neck but the reason

---

[24]Dr. Vaughn noted a diagnosis of hypothyroidism rather than hyperthyroidism as assessed by the endocrinologist. [AR 208, 309.]

was unclear.  The x-ray impression was: "multilevel degenerative disc change with potential bony canal impingement at C5-6." [AR 314.][25]

In reviewing the objective medical evidence and Dr. Vaughn's report, the Court is not convinced that Dr. Vaughn's report constitutes substantial evidence to support the ALJ's findings. In addition, the ALJ's statement that Gutierrez's "orthopedic condition is relatively benign and does not impose significant work related limitations," does not square with Gutierrez's medical history and appears to be the ALJ's medical judgment.  Moreover, the ALJ's additional reliance on a mental health counselor's statement that  Gutierrez had no "current significant health problems" in December 2006 [AR 18] is somewhat questionable.  The mental health counselor was not a licensed physician who could conduct a physical examination of Gutierrez, nor had that counselor seen Gutierrez more than two times as of December 14, 2006. [AR 250, 252, 259.]

For all of the above-stated reasons, the Court determines that this matter should be remanded for additional administrative proceedings.  In remanding the case, the Court does not intend to dictate any result or to comment on the strength of Gutierrez's DIB application.  The case is remanded to assure "that the correct legal standards are invoked in reaching a decision based on the facts of this case."  Huston v. Bowen, 838 F.2d 1125, 1132 (10th Cir. 1988).

---

[25]Additionally, it is unclear why the ALJ discussed the diagnostic imaging of Gutierrez's cervical spine performed in 2003 rather than the more current 2006 study.  However, that ALJ noted that the 2003 study disclosed "no acute abnormalities." [AR 17, 186.] In contrast, the 2006 study disclosed miltilevel degenerative disc change as discussed above. [AR 314.]

## VI.     <u>CONCLUSION</u>

IT IS THEREFORE ORDERED that Plaintiff Gutierrez's motion for remand is GRANTED and this matter is remanded for further administrative proceedings consistent with this Memorandum Opinion and Order.

_____
Lorenzo F. Garcia
United States Magistrate Judge

33